**IN THE COURT OF APPEALS OF IOWA**

No. 17-2067
Filed January 23, 2019

**IN RE THE MARRIAGE OF REBECCA JO LYNCH
AND EDWARD JAMES LYNCH**

**Upon the Petition of
REBECCA JO LYNCH,**
　　Petitioner-Appellee/Cross-Appellant,

**And Concerning
EDWARD JAMES LYNCH,**
　　Respondent-Appellant/Cross-Appellee.
_____

　　Appeal from the Iowa District Court for Greene County, Adria Kester, Judge.


　　Edward Lynch appeals, and Rebecca Lynch cross-appeals, a decree of dissolution of marriage. **AFFIRMED AS MODIFIED ON APPEAL; AFFIRMED IN PART AND AFFIRMED AS MODIFIED IN PART ON CROSS-APPEAL.**


　　Danni J. Harris of Hope Law Firm, PLC, Ankeny, for appellant.

　　James R. Van Dyke of Law Office of James R. Van Dyke, P.C., Carroll, for appellee.


　　Considered by Vaitheswaran, P.J., and Doyle and Mullins, JJ.

**MULLINS, Judge.**

Edward Lynch appeals, and Rebecca Lynch cross-appeals, a decree of dissolution of marriage. Edward challenges the award of traditional spousal support in favor of Rebecca. Rebecca challenges the awards of spousal support and trial attorney fees as inadequate and contends the district court erred in setting aside the entirety of the premarital value of Edward's retirement account.

## I.     Background Facts and Proceedings

The parties dated and lived together for about five years from 1985 to 1990. In 1991, Rebecca moved to Pennsylvania and married another man. That marriage ended in 1994, after which Rebecca returned to Iowa. The parties began dating again and living together in 2000. They married in 2004. At the time of trial, Rebecca was fifty-eight years of age and Edward was fifty-six.

At the time of trial, Edward's gross annual income amounted to $112,600. Edward has a retirement account with his employer. The value of the account prior to the marriage was $89,000. At the time of trial, its value was $183,618.[1] Edward has some back issues and suffers from arthritis in both hands and his lower back but is otherwise in good physical health.

Rebecca dropped out of high school after completing her freshman year. After dropping out, Rebecca was unemployed for a number of years. She began working in her father's bar when she turned eighteen. She worked in the bar from 1977 until 1991, when she moved to Pennsylvania. After her first marriage ended

---

[1] The district court valued Edward's retirement account at $159,720. We fully acknowledge the evidence presented by the parties concerning the value of the retirement account was extremely confusing. That being said, upon our review of the evidence and testimony, we value the account at $183,618.

in 1994, Rebecca returned to Iowa and continued working in the bar until 2000. In her trial testimony, Rebecca downplayed her role in the bar business, generally indicating she performed only menial tasks. Edward testified Rebecca's role was more than that, indicating Rebecca ran the business. Medical records admitted into evidence by Rebecca and the deposition testimony of her physician support Edward's position, as Rebecca reported to her physician that she ran and managed the bar and restaurant.

After she discontinued her work at the bar, Rebecca started working as a "cleaning lady" at a hospital and earned minimum wage. Rebecca continued in this position until 2008, when she quit because of what she describes as communication difficulties. However, she reported to Edward that she left her employment because her mother was sick.[2] Rebecca has not been meaningfully employed since 2008.[3] She testified she has no source of income and no prospects whatsoever of obtaining employment. When asked whether she has sought employment, Rebecca responded, "I have done nothing." Rebecca responded in the negative when asked whether she thought she needed to seek employment. Edward has spoken with Rebecca about getting a job in the past, to which Rebecca responded, "Don't you ever tell me I have to get a job."

Rebecca was diagnosed with situational depression in 2008. She also has degenerative arthritis in one of her knees and some skin and insomnia issues. One of her children, Gregory, was diagnosed with ALS in 2012. He passed away

---

[2] Rebecca's mother passed away in late 2010.
[3] Rebecca did clean her nephew's house between 2010 and 2012. She was paid ten dollars per hour and worked two hours per month.

in 2017. In the two years leading up to his death, Gregory lived in Des Moines. Rebecca visited and cared for him daily. As to the state of her "emotional health," Rebecca testified her "main problems" concern the loss of her son and the process of "going through this," presumably the dissolution of her marriage. She testified her physical health is "okay."

Rebecca generally testified that she has difficulty with reading and writing, which stems from her lack of competency in spelling. However, she testified she has no problems in responding to medical questionnaires when she visits her primary care physician. She is also able to follow instructions on when to take her various medications by writing them down. She is able to review bills and satisfy them by writing a check and addressing an envelope. Rebecca unequivocally testified she can read "prayer books." When presented with such a book during her trial testimony, she was able to read from it. She has not sought vocational training or pursued disability benefits as a result of her alleged inability to read or write. She is also able to communicate with others through email and social media. Rebecca has been an active participant in reviewing loan documents during the marriage. Edward testified he was completely unaware of Rebecca's alleged incompetency in reading and writing; she did not advise him of the issue until after she filed her dissolution petition. Rebecca did not advise her physician of the same until after the parties began discussing the possibility of dissolving the marriage. Rebecca's physician referred her to psychologists for learning-disability testing. There is no evidence in the record that Rebecca ever pursued any such testing.

Rebecca filed her petition for dissolution of marriage in October 2016. Trial was held in October 2017. In its decree, the court divided the assets, which

included awarding Edward the entirety of his retirement account and ordering him to pay Rebecca an equalization payment in the amount of $30,000; ordered Edward to pay Rebecca permanent spousal support in the amount of $2000 per month, said amount being reduced dollar for dollar by any social security spousal benefits Rebecca draws from Edward's account; and ordered Edward to pay Rebecca $2500 in trial attorney fees.

Edward filed a motion to enlarge or amend pursuant to Iowa Rule of Civil Procedure 1.904(2), challenging the award of permanent spousal support in light of the property distribution. Rebecca filed her own motion to enlarge or amend, requesting an increase in the award of spousal support. She filed a second motion requesting an increase in her award of attorney fees. In its ruling on the motions, the court largely declined the parties' requests as to spousal support, but recalculated its property distribution to not consider the premarital value of Edward's retirement account, and struck the requirement that Edward pay Rebecca an equalization payment.

As noted, both parties appeal.

## II.    Standard of Review

Review of dissolution cases is de novo. Iowa R. App. 6.907; *In re Marriage of Larsen*, 912 N.W.2d 444, 448 (Iowa 2018). While we give weight to the factual findings of the district court, especially when considering the credibility of witnesses, we are not bound by them. Iowa R. App. P. 6.904(3)(g); *In re Marriage of Fennelly*, 737 N.W.2d 97, 100 (Iowa 2007). Because the court bases its decision on the unique facts of each case, precedent is of little value. *In re Marriage of Brown*, 776 N.W.2d 644, 647 (Iowa 2009).

**III.    Analysis**

   A.    Retirement Account

Rebecca complains of the district court's decision in its ruling on post-trial motions to set aside the premarital value of Edward's retirement account. She also argues the district court assigned an incorrect value to the retirement account. As mentioned above, we agree with her on the latter point and value the account at $183,618. Generally, Rebecca requests that we include the premarital value of the retirement account in the property-distribution calculation and award her an equalization payment to reflect the difference between the parties' resulting net marital equities.

We agree with Rebecca that premarital property is not automatically excluded from the marital estate like gifted or inherited property; rather, it is subject to division and its status is merely one factor to be considered in dividing the marital estate. *See* Iowa Code § 598.21(5)(b) (2016); *Fennelly*, 737 N.W.2d at 102 (Iowa 2007); *In re Marriage of Hansen*, 886 N.W.2d 868, 872 (Iowa Ct. App. 2016). An asset's status as premarital property "may justify a full credit, but does not require it." *In re Marriage of Miller*, 552 N.W.2d 460, 465 (Iowa Ct. App. 1996). In determining whether premarital property should be divided as part of the marital estate, we consider all of the factors contained in Iowa Code section 598.21(5). *See Fennelly*, 737 N.W.2d at 102. Other factors relevant to this case include the length of the marriage, the contribution of each party to the marriage, the age and physical and emotional health of the parties, the earning capacity of each party, accompanying awards of spousal support, other economic circumstances of each

party, and any other factors the court may deem relevant. Iowa Code § 598.21(5)(a), (c), (d), (f), (h), (i), (m).

Here, the parties' marriage of thirteen years[4] is not so short for us to conclude that Rebecca's claim to the premarital property is "minimal at best," nor is it long enough for us to conclude the premarital property should absolutely be included in the marital estate. *Compare Hansen*, 886 N.W.2d at 872–73 (noting four-year marriage was not a long-term marriage and wife's claim to a share in premarital property was "minimal at best"), *and In re Marriage of Dean*, No. 12-1746, 2013 WL 5498153, at *3 (Iowa Ct. App. Oct. 2, 2013) (finding seven-year marriage one "of relatively short duration" and weighing against dividing premarital property), *with In re Marriage of Sullins*, 715 N.W.2d 242, 246–47 (Iowa 2006) (dividing premarital property in twenty-six-year marriage).

In considering the parties' respective contributions to the marriage, we consider both economic and non-economic aspects. *See Fennelly*, 737 N.W.2d at 104 ("Each person's total contributions to the marriage cannot be reduced to a dollar amount. Many contributions are incapable of calculation, such as love, support, and companionship."). From an economic standpoint, the income Rebecca generated during the marriage during the years that she was not caring for her son on a full-time basis was minimal. Edward, on the other hand, worked throughout the marriage and provided for Rebecca so she could have the

---

[4] Rebecca argues that in considering the issues in this case we should consider the length of the parties' relationship rather than the length of the marriage. We reject the argument. *See* Iowa Code §§ 598.21(5)(a) (directing courts to consider the "length of the *marriage*" in making orders for disposition of property (emphasis added)), 598.21A(1)(a) (directing courts to consider the "length of the *marriage*" in making orders for spousal support (emphasis added)).

important opportunity of visiting and caring for her son following his diagnosis. Although economic contributions "must not be emphasized over the other contributions made to a marriage," *id.* (quoting *Miller*, 552 N.W.2d at 465), there was very little evidence presented in this case concerning the parties' non-economic contributions to the marriage. We assume that each of the parties provided love and companionship to one another, at least until the marriage began to sour. As to the provision of emotional support, we find Edward carried the heavier load.

We next consider the age and physical and emotional health of the parties. The parties are close in age. Although both parties suffer from physical-health issues, we find each of them have "okay" physical health, as was described by Rebecca. Rebecca suffers from situational depression, but the record supports a conclusion that her symptoms were waning at the time of trial. As to the parties' respective earning capacities, Edward obviously fairs better. His most recent gross annual income was in the six-figure range, while Rebecca had not been meaningfully employed for roughly ten years. However, we reject Rebecca's position that she should not have to and cannot seek employment. She ran a business in the past; she is equipped with several marketable skills. As to other economic circumstances of the parties, Rebecca's cost of living is minimal. The decree awarded her a house, vehicle, and personal property, all free from encumbrances.

Upon our de novo review of the record, we find equity requires that Edward should receive a credit for most of the premarital value of his retirement account and a small portion of the premarital value should be included in the divisible

marital estate. Edward contributed to his retirement account for many years before the commencement of this moderate-length marriage. We conclude that including one quarter of the premarital value of the account in the divisible estate, coupled with an equalization payment from Edward to Rebecca in the amount of $7500 achieves equity between the parties. Such a distribution provides the parties with a roughly equal share of the marital estate:

| ASSETS | | |
|---|---|---|
| | Rebecca | Edward |
| Marital Home | $61,000 | — |
| Chrysler | $5600 | — |
| Ford | — | $0 |
| Motorcycle | — | $6000 |
| Personal Property | $10,000 | $2000 |
| Retirement Account | — | $116,868[5] |
| Bank Accounts | $800 | $26,000 |
| **TOTAL ASSETS** | **$77,400** | **$150,868** |
| LIABILITIES | | |
| Marital Home Mortgage | — | ($48,988) |
| Chrysler Note | — | ($4000)[6] |
| Motorcycle Note | — | ($5000) |
| **TOTAL LIABILITIES** | **$0** | **($57,988)** |
| EQUALIZATION ADJUSTMENT | | |
| Assets Less Liabilities | **$77,400** | **$92,880** |
| Equalization Payment | $7500 | ($7500) |
| **NET MARITAL EQUITY** | **$84,900** | **$85,380** |

Accordingly, we modify the district court's property distribution to award Rebecca an equalization payment in the amount of $7500 to be paid by Edward within thirty days after the issuance of procedendo.

---

[5] This marital property value is reached by taking the total value of the retirement account ($183,618), minus the portion of the account allocated to Edward as separate property, not subject to distribution as marital property (three quarters of the $89,000 premarital value, which is $66,750).

[6] Although the district court assigned this liability to Edward in its decree, it neglected to include it in its calculation in its ruling on post-trial motions.

B.      Spousal Support

Both parties challenge the district court's award of traditional spousal support in the amount $2000 per month in favor of Rebecca. "A trial court has considerable latitude when making an award of spousal support." *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 486 (Iowa 2012). We will only disturb the award if it fails to do equity between the parties. *Id.*

The district court may grant an award of spousal support in a dissolution proceeding for a limited or indefinite length of time after considering all of the following factors:

> a. The length of the marriage.
> b. The age and physical and emotional health of the parties.
> c. The distribution of property made pursuant to section 598.21.
> d. The educational level of each party at the time of marriage and at the time the action is commenced.
> e. The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, . . . and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.
> f. The feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal.
> g. The tax consequences to each party.
> . . . .
> j. Other factors the court may determine to be relevant in an individual case.

Iowa Code § 598.21A(1). Iowa law is clear "that whether to award spousal support lies in the discretion of the court, that we must decide each case based upon its own particular circumstances, and that precedent may be of little value in deciding each case." *In re Marriage of Gust*, 858 N.W.2d 402, 408 (Iowa 2015).

We first consider the length of the marriage. *See* Iowa Code § 598.21A(1)(a). This is an important factor for our consideration in reviewing an award of traditional spousal support. *See Gust*, 858 N.W.2d at 410. "Traditional spousal support is often used in long-term marriages where life patterns have been largely set and 'the earning potential of both spouses can be predicted with some reliability.'" *Id.* (quoting *In re Marriage of Francis*, 442 N.W.2d 59, 62–63 (Iowa 1989)). While there is no precise formula, "the shorter the marriage, the less likely a court is to award traditional spousal support." *Id.* Only "marriages lasting twenty or more years commonly cross the durational threshold" that would make an award of traditional support appropriate. *Id.* at 410–11. Edward and Rebecca's marriage of thirteen years falls well short of the durational threshold, thus rendering an award of traditional spousal support quite questionable. *See id.*; *see also In re Marriage of Gutcher*, No. 17-0593, 2018 WL 5292082, at *3 (Iowa Ct. App. Nov. 7, 2018) (finding traditional support inapplicable in marriage of thirteen years). But this is not the only factor we consider.

We have already addressed the age and physical and emotional health of the parties, above; the parties are close in age and neither has serious physical health problems, but Rebecca suffers from situational depression, which her physician hoped would get somewhat better with the reduction of stress. *See* Iowa Code § 598.21A(1)(b). The distribution of property ordered above is equitable and relatively equal. *See id.* § 598.21A(1)(c). No evidence was presented concerning Edward's educational background, but Rebecca dropped out of high school following her freshman year. *See id.* 598.21A(1)(d).

We turn to the earning capacity of these parties, which this litigation focused on, primarily as to Rebecca. At the time of trial, Edward was earning $112,600 in gross annual income. Rebecca maintains she is unemployable because she cannot read or write. To put it simply, upon our de novo review, we find Rebecca's allegation that she cannot read or write wholly non-credible. There is a wealth of evidence that she has the ability to read and write proficiently. Also, the fact that this affliction was never mentioned until the possibility of dissolution of the marriage reared its head is suspect. Rebecca worked in, and managed, her father's bar for roughly twenty years. She then worked at a hospital for four years before the marriage, and continued to do so for four years after the parties were married. She quit that job in 2008 due to communication issues or to care for her sick mother, who ultimately passed away in late 2010. She also dedicated a lot of her time to her son following his 2012 diagnosis and until his death in 2017. Although Rebecca has not been meaningfully employed in approximately ten years, we find she has marketable skills, is employable, and could easily find a job and earn gross income in the neighborhood of $15,000.00 per year. We do not view Rebecca's unemployment during the marriage as a standard of living which she should be entitled to continue post-dissolution at Edward's expense. The record indicates Rebecca's unemployment was for the purpose of caring for ill relatives. The necessity of her unemployment for that purpose no longer exists.

We next consider the feasibility of Rebecca becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage. *See* Iowa Code § 598.21A(1)(f). There was little evidence presented about the parties' lifestyle during the marriage. What is clear is that they struggled financially as a

result of having only one income. The parties did not live in an expensive home or drive expensive cars, and they had few assets at the time of trial. Simply stated, the standard of living Rebecca enjoyed during the marriage was not lavish. Likewise, her cost of living is not outstanding. Furthermore, the property distribution has provided Rebecca with an automobile and home without the burden of any debt. While we find Rebecca has the ability to earn $15,000 per year, we agree that a moderate award of spousal support is appropriate to allow her to live in a fashion similar to that she enjoyed during the marriage.

Upon our consideration of the factors contained in section 598.21A(1), we find a moderate award of spousal support in favor of Rebecca is appropriate. However, based on the circumstances of this case, we agree with Edward the district court's award is excessive. We conclude Edward should pay Rebecca monthly spousal support in the amount of $1000. The parties appear to agree Rebecca will be receiving a portion of Edward's social security benefits "someday." Based upon the parties' arguments in the district court and before this court, the monthly benefits she will receive will exceed the monthly spousal support award. Rebecca concedes it would be equitable to reduce her award "dollar-for-dollar" when she begins to draw benefits. We therefore order that Edward's spousal support obligation shall cease upon the earlier of either Edward's death, Rebecca's death or remarriage, or Rebecca's receipt of social security benefits or her eligibility to receive divorced spouse full retirement social security benefits from Edward's account. *See In re Marriage of McCurnin*, 681 N.W.2d 322, 331 (Iowa 2004); *cf. In re Marriage of Ennenga*, No. 04-1641, 2005 WL 2756723, at *3 (Iowa Ct. App. Oct. 26, 2005). We further order that Rebecca has an affirmative

obligation to notify Edward immediately upon her receipt of social security benefits if the spousal support obligation has not earlier terminated.

We modify the spousal support award in favor of Rebecca to $1000 per month as set forth above.[7]

C.     Attorney Fees

Rebecca challenges the district court's award of attorney fees in the dissolution proceedings as inadequate. "We review this award for an abuse of discretion." *See Sullins*, 715 N.W.2d at 255. This is our most deferential standard of review. *See State v. Roby*, 897 N.W.2d 127, 137 (Iowa 2017). "Trial courts have considerable discretion in awarding attorney fees." *In re Marriage of Witten*, 672 N.W.2d 768, 784 (Iowa 2003) (quoting *In re Marriage of Guyer*, 522 N.W.2d 818, 822 (Iowa 1994)). The fees must be fair and reasonable and whether they should be awarded depends on the respective abilities of the parties to pay. *Id.* Upon our de novo review, we are unable to say the district court abused its discretion in its attorney fee award. We therefore affirm the award.

## IV.     Conclusion

We affirm the district court but modify the decree in two respects. We modify the district court's property distribution to award Rebecca an equalization payment in the amount of $7500 to be paid by Edward within thirty days after the

---

[7] We decline Rebecca's invitation to apply the "*Gust* formula" or the American Academy of Matrimonial Lawyers (AAML) guidelines to reach a figure on this issue. "[W]e do not employ a mathematical formula to determine the amount of spousal support." *Gust*, 858 N.W.2d at 412. The *Gust* formula is nothing more than a "reasonable guide." *In re Marriage of Larson*, No. 14-1333, 2015 WL 5965116, at *7 (Iowa Ct. App. Oct. 14, 2015); *see also In re Marriage of Fitzgerald*, No. 14-1729, 2015 WL 3625040, at *3 (Iowa Ct. App. June 10, 2015); *In re Marriage of Johnson*, No. 14-1271, 2015 WL 1848657, at *2 (Iowa Ct. App. Apr. 22, 2015). Likewise, the AAML guidelines are not Iowa law. *Gust*, 858 N.W.2d at 416 n.2.

issuance of procedendo. We modify the spousal support award in favor of Rebecca to $1000 per month, to terminate upon the earlier of either Edward's death, Rebecca's death or remarriage, or Rebecca's receipt of social security benefits or her eligibility to receive divorced spouse full retirement social security benefits from Edward's account. We affirm the district court's award of trial attorney fees. Costs on appeal are assessed equally between the parties.

**AFFIRMED AS MODIFIED ON APPEAL; AFFIRMED IN PART AND AFFIRMED AS MODIFIED IN PART ON CROSS-APPEAL.**