# IN THE COURT OF APPEALS OF IOWA

No. 22-0238
Filed August 17, 2022

**IN RE THE MARRIAGE OF ANDREA M. HARGRAFEN
AND KYLE D. HARGRAFEN**

**Upon the Petition of**
**ANDREA M. HARGRAFEN, n/k/a ANDREA M. CANBY,**
        Petitioner-Appellant/Cross-Appellee,

**And Concerning**
**KYLE D. HARGRAFEN,**
        Respondent-Appellee/Cross-Appellant.
_____

        Appeal from the Iowa District Court for Delaware County, Michael J. Shubatt, Judge.

        A party appeals the parenting time and physical care provisions of a dissolution decree and the other party cross-appeals. **AFFIRMED ON BOTH APPEALS.**

        Jeremy N. Gallagher of Kintzinger, Harmon, Konrardy, P.L.C., Dubuque, for appellant/cross-appellee.

        Mark A. Roeder of Roeder Law Office, Manchester, for appellee/cross-appellant.

        Considered by Bower, C.J., and Schumacher and Ahlers, JJ.

**SCHUMACHER, Judge.**

Andrea Canby, formerly Andrea Hargrafen, appeals the parenting time and physical care provisions of the parties' dissolution decree. Kyle Hargrafen cross-appeals on issues of physical care, daily video and/or telephone calls with the children, and the property distribution. Both parties request appellate attorney fees. We affirm on both appeals.

## I.       Background Facts & Proceedings

Kyle and Andrea were married in 2016. They have two children, E.H., born in 2017, and K.H., born in 2019. The parties separated in July 2020. Andrea remained in the marital home in Manchester and Kyle moved to his parents' home in Hopkinton. The distance between homes is about eighteen miles. Andrea filed a petition for dissolution of marriage on July 29, 2020. The parties informally agreed to joint physical care of the children; a temporary order was not requested. Andrea cared for the children three and one-half days a week when she was not working and Kyle cared for the children on the remaining three and one-half days of the week. This joint physical care arrangement continued for approximately a year before the dissolution trial.

Andrea is employed as an emergency room nurse at Regional Medical Center in Manchester. She works three days a week, from 6:30 p.m. to 7:00 a.m. The three days are usually consecutive but are not always the same three days each week. In order to help pay for the dissolution, Andrea began working one to two days a month at the Anamosa State Penitentiary. She has annual income of $52,629.00 from these two jobs.

Kyle works at Colony Brands in Peosta. Throughout most of the marriage he worked the second shift, usually from 3:00 p.m. to 11:00 p.m., on Monday through Friday. A few weeks before the dissolution trial Kyle changed to the first shift, which is from 6:30 a.m. to 2:30 p.m. Kyle works some overtime during the holiday season. Kyle's annual income is $33,959.00.

The parties stipulated to the disposition of all liabilities and most assets prior to trial. The dissolution trial was held in September 2021. The older child was then four-years-old and the younger child was two. The parties agreed to joint legal custody of the children. Both parties requested that they be awarded physical care or in the alternative, that the parties be awarded joint physical care. Andrea requested a right of first refusal, so that if Kyle was not able to personally care for the children, she would be given the option to care for them. Kyle requested that daily video and/or phone contact be allowed with the children.

In the dissolution decree, filed in November 2021, the court awarded the parties joint physical care on "a week-on, week-off schedule," with exchanges every Sunday at 6:00 p.m. The court denied Andrea's request for a right of first refusal and denied Kyle's request for daily video and/or telephone contact with the children. The court set a holiday visitation schedule and ordered Andrea to pay $155.00 per month in child support.

Concerning the contested assets of the parties, the court set aside to Kyle a 1999 Firebird valued at $3000.00 and an Edward Jones account valued at $25,000.00, as such were gifts Kyle received prior to the marriage from his parents. The court found the marital residence was a marital asset, although Andrea paid the down payment with premarital funds. Andrea's student loan debt was included

as a marital liability. The court found Kyle was awarded a slightly greater amount of net marital property but did not require him to pay an equalization payment. The court determined each party should be responsible for their own attorney fees.

Kyle filed a motion pursuant to Iowa Rule of Civil Procedure 1.904(2). Andrea also filed a rule 1.904(2) motion. Each party resisted the other party's motion.

The court entered a ruling on the post-trial motions on January 25, 2022. The court (1) instituted a cost-sharing provision requiring Andrea to pay fifty-nine percent and Kyle to pay forty-one percent of some of the children's expenses; (2) denied Andrea's request for a right of first refusal; (3) adjusted the property division to require Andrea to pay $5000.00 to Kyle; (4) denied Kyle's request for daily scheduled telephone and video visitation on the days the parents did not have the children in their care; (5) clarified who would receive the dependent income tax credit for tax purposes; (6) specified who would be responsible for transportation for visitation; and (7) set out which school district the children would attend. Andrea appealed and Kyle cross-appealed.

## II. Standard of Review

We review dissolution of marriage decrees in equity. *In re Marriage of Knickerbocker*, 601 N.W.2d 48, 50 (Iowa 1999). In equitable actions, our review is de novo. Iowa R. App. P. 6.907. "In such cases, '[w]e examine the entire record and adjudicate anew rights on the issues properly presented.'" *Knickerbocker*, 601 N.W.2d at 50–51 (alteration in original) (citation omitted). "In equity cases, especially when considering the credibility of witnesses, the court gives weight to

the fact findings of the district court, but is not bound by them."  Iowa R. App. P. 6.904(3)(g).

### III.    Right of First Refusal

Andrea claims the court should have included a right of first refusal in the parties' dissolution decree.  She states that such a provision would be in the children's best interests because the children could be cared for by a parent while the other parent is working, rather than placing the children in the care of relatives or in daycare.  During the weeks Kyle has the children, they must be cared for by someone other than Kyle during the time he is at work.  The same holds true for the weeks Andrea has the children.  Andrea requests a provision that requires that if a parent is going to be unable to care for the children because they are working, the parent should be required to ask the other parent to care for the children before asking anyone else.  The primary consideration in determining whether a right of first refusal should be granted is the best interests of the children.  *In re Marriage of Klemmensen*, No. 14-1292, 2015 WL 2089699, at *3 (Iowa Ct. App. May 6, 2015).

A right of first refusal has been approved in certain situations.  *See Varner v. Conway*, No. 20-0143, 2021 WL 3661143, at *7 (Iowa Ct. App. Aug. 18, 2021) (granting a right of first refusal "when either biological parent knows they will be leaving town during their care time and unable to personally care for the child for more than twenty-four hours"); *In re Marriage of Brown*, No. 19-0705, 2020 WL 569344, at *5 (Iowa Ct. App. Feb. 5, 2020) (providing for a right of first refusal when a parent was unable to care for the children for twelve hours or more);

*Klemmensen*, 2015 WL 2089699, at *3 (granting a right of first refusal where the father was required to work twelve or more hours on some weekends).

A right-of-first-refusal provision has been rejected, however, where adding the provision "would only complicate matters and create stress and animosity between the parties." *Dirks v. Eccles*, No. 19-0994, 2020 WL 2071116, at *4 (Iowa Ct. App. Apr. 29, 2020). There, the court noted the child would "benefit from a structured custodial schedule." *Id.*; *see also In re Marriage of Johnsen*, No. 20-0779, 2021 WL 2690019, at *4 (Iowa Ct. App. June 30, 2021) (denying a request for a right of first refusal when a parent was away for four hours or more, as it would "only result in additional conflict"); *c.f. Klemmensen*, 2015 WL 2089699, at *4 (finding the provision was appropriate because it would not result in heightened conflict between the parents).

The district court did not include a right-of-first-refusal provision in the parties' dissolution decree but informed the parties they could agree to this practice, stating:

> The parties are divorcing themselves from each other and will be co-parenting on a shared care basis. They should remain free to care for and raise the children as they see fit during those times when the decree provides that they are to be in their care. If the parties want to agree with one another to allow each other visitation time during their respective weeks when they are unable to care for the children personally, they certainly may do so. That is between them, however, and will not be Court-ordered. The same is true with any temporary adjustments or variations the parties want to make with respect to the week-on, week-off schedule.

We determine that a right of first refusal on this record is not in the children's best interest. Andrea's work schedule is not the same every week. And the hours Andrea gets off and picks up the children have widely varied. While Andrea was

scheduled to pick the children up from Kyle's at 5:00 p.m., those pickups varied from 3:20 p.m. to 8:05 p.m. with less than a half hour notice to Kyle. The consistency of a schedule when the children are with each parent is in the children's best interest. Under the proposed right of first refusal, the parents could be exchanging the children daily. These exchanges would occur, under the parties' current work schedule, on many occasions before 6:30 a.m. We affirm the district court on this issue.

## IV.    Physical Care

Andrea contends that if her request for a right of first refusal is denied, then she should be awarded physical care of the children. She states that while the parents shared many tasks equally, she took the children to medical appointments. She also states that she involved the children in activities, such as dance lessons and swimming lessons. Andrea believes Kyle did not respect her and tried to spy on her. In his cross-appeal, Kyle asks to have the children placed in his physical care. He questions Andrea's mental stability, highlighting alleged suicidal ideation.

In considering which parent should be awarded physical care of children, the court considers the factors in Iowa Code section 598.41(3) (2020) and *In re Marriage of Winter*, 223 N.W.2d 165, 166-67 (Iowa 1974). "[T]he factors of continuity, stability, and approximation are entitled to considerable weight" when making a decision regarding physical care. *In re Marriage of Hansen*, 733 N.W.2d 683, 700 (Iowa 2007). Courts look for a placement that will best promote the long-term physical and emotional health of the child. *Id.* Each decision is based on the unique facts and circumstances of the case. *Id.* "In child custody cases, the first and governing consideration of the courts is the best interests of the child." Iowa

R. App. P. 6.904(3)(o); *In re Marriage of Roberts*, 954 N.W.2d 757, 760 (Iowa Ct. App. 2020).

The district court addressed each spouse's concerns regarding the parenting of the other spouse. The court found, "While Andrea may have underlying mental health issues, it appears to the Court that she has addressed whatever those issues might be and that they will not prevent her from being a good parent to her children." Concerning Kyle's actions when he was spying on Andrea, the court found, "[A]s with Andrea's behaviors, they do not appear likely to continue once this action is concluded and the parties go on with their lives, nor do they appear likely to impact his ability to parent the children."

While each parent sought physical care of the children, they alternatively requested joint physical care. The court carefully considered the appropriate factors for determining whether joint physical care was in the best interests of the children. *See Hansen*, 733 N.W.2d at 697–99. These factors are:

> (1) "approximation"—what has been the historical care giving arrangement for the child between the two parties; (2) the ability of the spouses to communicate and show mutual respect; (3) the degree of conflict between the parents; and (4) "the degree to which the parents are in general agreement about their approach to daily matters."

*In re Marriage of Berning*, 745 N.W.2d 90, 92 (Iowa Ct. App. 2007) (quoting *Hansen*, 733 N.W.2d at 697–99). The court determined joint physical care with a "week-on, week-off schedule" was in the children's best interests, as it provided "the greatest amount of certainty as to [the parents'] parenting responsibilities."

The district court heard the parties' testimony and observed them in the courtroom. The Iowa Supreme Court has stated:

> The deference we pay to trial court findings is especially strong here. As will appear, the case turns, not so much on what was said and done, as upon the implications of the words and actions of the parties. In resolving such a case a trial court, as first-hand observer of witnesses, holds a distinct advantage over an appellate court, which necessarily must rely on a cold transcript.

*In re Marriage of Udelhofen*, 444 N.W.2d 473, 474 (Iowa 1989). We agree with the district court's assessment that joint physical care is in the best interests of the children.

### V. Visitation

Kyle requests video and/or telephone visitation with the children every day while they are in Andrea's care. He states that he would allow Andrea the same access to the children while they are in his care. Kyle argues it is important for the parents to have daily contact with the children, even when they are not in the parent's care. Specifically, Kyle requests that he have video and/or telephone visitation nightly when the children are in Andrea's care for up to five minutes with each child within an hour before the children's bedtime, and that Andrea exercise five minutes of telephone and/or video visitation between 5:30 p.m. and 6:30 p.m. on nights she works, and within one hour before the children's bedtimes when Andrea does not work.

Generally, liberal visitation with the noncustodial parent is in the children's best interests. Iowa Code § 598.41(1)(a); *In re Marriage of Stepp*, 485 N.W.2d 846, 849 (Iowa Ct. App. 1992). In the case *In re Marriage of Coon*, a father who did not have physical care of the children was granted the right to have a daily telephone call. No. 14-1919, 2015 WL 5308976, at *1 (Iowa Ct. App. Sept. 10, 2015). Later, the decree was modified to reduce the number of telephone calls.

*Id.* Also, in *In re Marriage of Kraft*, a father who did not have physical care of the children was granted two mandatory telephone calls per week. No. 99-1719, 2000 WL 1289135, at *2 (Iowa Ct. App. Sept. 13, 2000). Kyle's situation is not like either of these cases because he has joint physical care of the children and spends alternating weeks with them.

The district court ruled, "The Court views this issue the same way it views Andrea's request for a right of first refusal. It is an issue that the parties should be able to negotiate themselves. Accordingly, this request for enlargement is denied." We agree with the denial of daily video and/or telephone contact. The district courts cannot be in the business of micromanaging the parties' and the children's lives. The parties are required to communicate as they share joint physical care. But the proposal, if adopted by the court, invites disagreements on when and if each parent received daily video and/or telephone contact at the correct time and for the correct length of time with the children when not in that parent's physical care. We decline to modify the decree concerning the requested daily video and/or telephone contact.

## VI. Property Division

In the dissolution decree, the court determined a 1999 Firebird valued at $3000.00 and an Edward Jones account valued at $25,000.00 should be set aside to Kyle because they were gifts he received from his parents prior to the marriage. The table of assets and liabilities attached to the dissolution decree, however, included the two items in the assets awarded to Kyle, resulting in total net assets awarded to Kyle of $54,349.00. Andrea received total net assets of $49,212.00.

The court did not order Kyle to pay an equalization payment, stating the result was equitable although not equal.

Kyle raised the discrepancy between the language of the dissolution decree and the court's calculation of the net martial assets he received in his rule 1.904(2) motion. He stated that if the value of the Firebird and Edward Jones account were excluded from the marital assets, he received total net marital assets of $26,349.00. Kyle asked for an equalization payment of $11,431.50. Andrea resisted Kyle's motion. She pointed out that the court did not give her credit for paying the down payment of $13,000.00 on the marital residence from her premarital funds.

In the ruling on the post-trial motions, the court recognized that it had incorrectly calculated the parties' assets in the table of assets and liabilities attached to the dissolution decree. The court determined Kyle had total net marital assets of $26,349.00 and Andrea had total net marital assets of $49,212.00. The court concluded Andrea should pay Kyle an equalization payment of $5000.00, rather than $11,431.50 as he requested. The court stated, "This decrease is equitable because it gives Andrea credit for approximately one-half of the down payment on the house, which came primarily out of her pre-marital funds." In the post-trial ruling, the district court listed the marital assets and liabilities of the marriage as follows:

**MARITAL ASSETS**

| | |
|---|---|
| **KYLE'S ASSETS** | **$37,549** |
| **KYLE'S DEBT** | **$11,200** |
| **KYLE'S NET** | **$26,349** |

| | |
|---|---|
| **ANDREA'S ASSETS** | **$200,266** |
| **ANDREA'S DEBT** | **$151,054** |
| **ANDREA'S NET** | **$49,212** |

Under this computation, Andrea's net is $22,863.00 more than Kyle. Kyle claims the division of assets and debts by the court was inequitable. He contends that the court should not have given Andrea credit for her payment of $13,000.00 for the down payment on the marital residence from premarital funds because she also had $13,701.00 of premarital student debt. He also asserts that Andrea kept the children's portion of $5455.00 from COVID stimulus money. Kyle states Andrea should be required to pay $11,431.50 to him as an equalization payment.

"[C]ourts equitably divide all of the property owned by the parties at the time of divorce except inherited property and gifts received by one spouse." *In re Marriage of Keener*, 728 N.W.2d 188, 193 (Iowa 2007). Property is divided "in an equitable manner in light of the particular circumstances of the parties." *In re Marriage of Schriner*, 695 N.W.2d 493, 496 (Iowa 2005). "An equitable distribution of marital property, based upon the factors in [section] 598.21(5), does not require an equal division of assets." *In re Marriage of McDermott*, 827 N.W.2d 671, 682 (Iowa 2013) (quoting *In re Marriage of Kimbro*, 826 N.W.2d 696, 703 (Iowa 2013)). We ordinarily will not disturb the district court's ruling unless it fails to do equity. *See In re Marriage of Smith*, 573 N.W.2d 924, 926 (Iowa 1998).

> Premarital property is not set aside like gifted and inherited property. [*In re Marriage of Fennelly*, 737 N.W.2d 97,102 (Iowa 2007)]; *In re Marriage of Miller*, 552 N.W.2d 460, 465 (Iowa Ct. App. 1996). The district court should not separate a premarital asset from the divisible estate and automatically award it to the spouse who owned it prior to the marriage. *Fennelly*, 737 N.W.2d at 102; [*In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006)]. Rather, property brought into the marriage by a party is merely a factor

among many to be considered under section 598.21(5). *Schriner*, 695 N.W.2d at 496. "[T]his factor may justify a full credit, but does not require it." *Miller*, 552 N.W.2d at 465. Other factors under section 598.21(5) include the length of the marriage, contributions of each party to the marriage, the age and health of the parties, each party's earning capacity, and any other factor the court may determine to be relevant to any given case. *See Fennelly*, 737 N.W.2d at 102.

In contrast, gifted and inherited property are considered non-marital property. Section 598.21(6), however, contains a qualification to the gift and inheritance set-aside rule: "[p]roperty inherited by either party or gifts received by either party prior to or during the course of the marriage . . . is not subject to a property division . . . except upon a finding that refusal to divide the property is inequitable to the other party." Our supreme court has identified a number of factors for courts to consider in determining whether gifted or inherited property should be divided:

(1) contributions of the parties toward the property, its care, preservation or improvement;

(2) the existence of any independent close relationship between the donor or testator and the spouse of the one to whom the property was given or devised;

(3) separate contributions by the parties to their economic welfare to whatever extent those contributions preserve the property for either of them;

(4) any special needs of either party;

(5) any other matter which would render it plainly unfair to a spouse or child to have the property set aside for the exclusive enjoyment of the donee or devisee.

*In re Marriage of Goodwin*, 606 N.W.2d 315, 319 (Iowa 2000) (quoting *In re Marriage of Muelhaupt*, 439 N.W.2d 656, 659 (Iowa 1989)). The court has also stated that "the length of the marriage may be an important factor in determining whether gifted [or inherited] property should be included in the court's property distribution." *Goodwin*, 606 N.W.2d at 319.

*In re Marriage of Antoine*, No. 09-1653, 2010 WL 5023072, at *6 (Iowa Ct. App. Dec. 8, 2010).

On this record, we do not find the trial court failed to do equity between the parties in awarding Kyle $5000.00 due to the down payment on the home made by Andrea with premarital funds. And we find the rational for inclusion of Andrea's

student loan debt as marital to be supported by this record. We affirm the property division of the trial court.[1]

### VII.    Attorney Fees

Andrea and Kyle both seek attorney fees for this appeal.  Neither have filed an attorney fee affidavit.  Appellate attorney fees are awarded upon our discretion and are not a matter of right.  *See In re Marriage of Okland*, 699 N.W.2d 260, 270 (Iowa 2005).  When considering whether to exercise our discretion, we consider "the needs of the party seeking the award, the ability of the other party to pay, and the relative merits of the appeal."  *Id.* (citation omitted).

After carefully considering each of these factors, we conclude each party should be responsible for payment of their respective appellate attorney fees.

**AFFIRMED ON BOTH APPEALS.**

---

[1] We decline to make any additional division concerning the stimulus checks received for the children, as we are unable to determine what, if any portion, of the children's stimulus funds, are reflected in Andrea's bank accounts that are included in the marital assets.